Francis Carling (FC 1016)
174 East 74th Street, Suite 12BC
New York, NY 10021-3533
(212) 628-3026

*Plaintiff Pro Se*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FRANCIS CARLING
            **:**

                 Plaintiff,            10 Civ. 4573
            **:**

         -against-            **COMPLAINT**
            **:**

KRISTAN PETERS
            **:**

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Francis Carling, appearing *pro* se, for his complaint in this action respectfully alleges:

### Nature of the Action

        1.      This is an action for fraud in the procurement of professional services, breach of contract, quantum meruit, negligence *per se*, defamation *per se*, and breach of the covenant of good faith and fair dealing.

### The Parties

        2.      Plaintiff Francis Carling is a lawyer admitted to practice in New York and Connecticut, and in numerous federal courts, including the Southern District of New York. He is a citizen of the State of New York, and resides in New York City.

        4.      Defendant Kristan Peters ("Peters") is a lawyer admitted to practice in New York and Connecticut, and in numerous federal courts. At the time of the events in question, Peters was a member of the bar of the Southern District, but was suspended from practice. She is a citizen of the State of Connecticut, and resides in Westport.

1

**Jurisdiction and Venue**

5.      There is complete diversity of citizenship between plaintiff and the defendant, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(1).

6.      The Court has inherent jurisdiction over issues of Peters' professional misconduct while a member of the bar of this Court.

7.      At the time of the events in question, both parties maintained offices for the practice of law in Manhattan, within this District.  Most, if not all, of the events giving rise to plaintiff's claims occurred within the Southern District of New York.  Venue is proper in this District under 28 U.S.C §§ 1391(a)(2).

**Factual Allegations**

8.      Plaintiff is a graduate of Yale Law School, and has practiced law for some forty years.  He began his practice in 1970 as a Legal Aid lawyer in New Haven, and from 1972 to 2007 practiced as a litigator at Sullivan & Cromwell, Winthrop, Stimson, Putnam & Roberts, and Collazo Carling & Mish LLP.  At the latter two firms he was a partner.  On January 1, 2008 he withdrew from full-time practice as a litigator to concentrate on working as a mediator and arbitrator.  His career as a lawyer has been unblemished.

9.      In recent years, Peters has been affiliated with, or a partner of, such distinguished law firms as Fulbright & Jaworksi L.L.P., Pillsbury Winthrop Shaw Pittman LLP, and Dorsey & Whitney LLP.  On information and belief, she was asked to leave each of those firms.

**The *Wolters Kluwer* Action**

10.      Peters joined Dorsey & Whitney as a partner in January 2007.  On or about March 21, 2007 she commenced an action in this Court on behalf of the plaintiff in *Wolters Kluwer Financial Services Inc. v. Scivantage et al.*, 07 Civ. 2352 (HB).  On April 24, 2007, the defendants moved for sanctions against the plaintiff in that action and its counsel, including Peters.

11.    Although the motion for sanctions was subsequently withdrawn by the defendants, this Court (Baer, J.) determined that, in the interests of justice, a hearing should be held on the issue of counsels' conduct.  Such a hearing was conducted over five days in the summer of 2007, concluding on September 12.

12.    On November 30, 2007, Judge Baer issued a 129-page decision in which he cited Peters for some 24 separate sanctionable actions.  In addition, he found that Peters had made a number of misrepresentations of fact to the Court for which she was not specifically sanctioned. *See Wolters Kluwer Financial Services, Inc. v. Scivantage*, 525 F.Supp.2d 448 (SDNY 2007).

13.    Peters filed three appeals to the Second Circuit (collectively, the "Appeal") from Judge Baer's various orders, and filed her own brief on the Appeal *pro se*.

### Peters' Scheme to Defraud Counsel

14.    Commencing in or about May 2007, Peters embarked upon a scheme to obtain counsel in the sanctions proceeding under false pretenses, and to induce counsel to give her services at a discount.  She falsely represented to counsel and potential counsel that she was wholly innocent of the charges pending against her, and that she was the victim of persecution by a vindictive district judge who was retaliating against her for charges she had filed against him with the Chief Judge of this District; and she made other false statements about the facts of the case   On information and belief, having secured the services of counsel on advantageous terms on the basis of such misrepresentations, and pursuant to her scheme, Peters failed to pay in full even discounted bills for services rendered by such counsel.

15.    Peters' scheme to impose herself unfairly on counsel in this fashion continued through the sanctions proceeding itself, and in the Appeal that followed.  On information and belief, the counsel on whom Peters imposed herself unfairly included, but were not necessarily

limited to, Charles Stillman, Michael S. Ross, Robert F. Katzberg, Marc L. Mukasey, James

Kaster, Thomas P. Malone, and plaintiff.

**Peters' Retention of Plaintiff**

16.     From 1982 until 1997, plaintiff was a partner of Winthrop, Stimson, Putnam &

Roberts.  In 1997, he left that firm to become a partner of Collazo Carling & Mish LLP ("the

Collazo Firm"), an employment-law boutique.  The Winthrop, Stimson firm subsequently

merged with other law firms and was renamed Pillsbury Winthrop Shaw Pittman LLP

("Pillsbury Winthrop").  The Collazo Firm is now named Collazo Florentino & Keil LLP.

17.     At the end of 2007, plaintiff retired as a partner of the Collazo Firm, but remained

as "of counsel" on a temporary basis.  Commencing January 1, 2008, plaintiff's practice had

three components:  (a) he continued to work, though on a steadily diminishing basis, on the

windup of matters he had handled at the Collazo Firm; (2) he began to build a practice as a full-

time mediator and arbitrator; and (3) he handled occasional new legal matters independently

from the Collazo Firm.

18.     On July 13, 2008, Peters sent plaintiff an e-mail at his home office stating that she

had been referred to him by Pillsbury Winthrop, and that she wished to consider retaining him to

handle the oral argument of her Appeal from Judge Baer's sanctions order.  Because this

appeared to be a referral from his former firm, plaintiff was willing to speak with Peters even

though the proposed retention did not fit within his professional plans.

19.     On July 14, 2008, Peters called plaintiff at his home office and spoke with him for

nearly four hours about her case.  In the course of that conversation, and in an effort to induce

plaintiff to serve as her counsel, she made numerous misrepresentations of fact, and also omitted

to state material facts that, by their omission, rendered other of her statements misleading.

20.     Among the misrepresentations and omissions made by Peters were the following:

(a)     Prior to the sanctions proceeding, Peters had a spotless record as a litigator, and had a distinguished career at Fulbright & Jaworski, Pillsbury Winthrop, and Dorsey & Whitney.  In fact, she had had professional difficulties at each of those firms, and had been asked to leave them.

(b)     Peters' leaving Pillsbury Winthrop stemmed from that firm's decision to close down its Stamford, Connecticut office, and had nothing to do with her performance.  In fact, on information and belief, she was terminated as a partner for performance reasons.  Peters omitted to state that Pillsbury Winthrop had declined to represent her on the Appeal because of the circumstances of her leaving that firm.  Had that fact been disclosed to plaintiff, he would not have considered representing Peters on the Appeal.

(c)     Peters resigned from Dorsey & Whitney voluntarily, because she felt the firm was not supporting her vigorously in the sanctions proceeding.  In fact, Dorsey & Whitney had told Peters that she would be terminated as a partner if she did not resign by a certain date, and thus her resignation on that date was not voluntary.

(d)     The sanctions proceeding was initiated by Judge Baer in retaliation for Peters' having complained about him to the Chief Judge.  In fact, no such complaint had been filed or made as of the commencement of the sanctions proceeding.

(e)     Peters had been blameless in her conduct in the *Wolters Kluwer* case, and the charges in the sanctions proceeding were trumped up by Judge Baer.  In fact, the findings of misconduct made in the sanctions proceeding were well-supported by the evidence in the record.

(f)      One of the most serious allegations in the sanctions proceeding was that Peters had directed Jordan Brackett, a Dorsey associate, to make notations on clean transcripts of depositions in order to support a false claim that the transcripts contained attorney work product that barred their delivery to this Court under an order of Judge Baer.  Judge Baer had found in the sanctions proceeding that Peters had admitted giving this instruction to Brackett, but had claimed that she was only "joking" when she gave it.  In her initial conversation with plaintiff (and in conversations with him for many months thereafter), Peters was adamant that there was no basis in the record for this finding.  According to her, she had testified that she was furious with Brackett in the conversation in question, and had made the remark sarcastically, in a tone that no one would regard either as a sincere instruction or a frivolous joke; and that Judge Baer had relied on Dorsey's testimony, not hers, in finding that she claimed to be "joking."  In fact, the record of the sanctions proceeding amply supported Judge Baer's finding that Peters' initial version of these events was that she claimed to have been merely "joking" with Brackett.

21.      In their initial conversation, plaintiff specifically told Peters that he had no interest in representing any client who might quibble about his bills, or fail to pay them promptly and in full.  Peters assured plaintiff that he had been highly recommended to her by his former firm, and that he would have nothing to worry about in that regard.  In fact, pursuant to the scheme alleged in paragraph 14 above, and on information and belief, Peters had made a practice of not paying her counsel in full, and had no intention of paying plaintiff in full for his services.

22.      Although Peters spent many hours (on July 14 and thereafter) telling plaintiff the supposed facts of her case, she was slow to supply him with the documents he needed to truly understand the case.  She did not give him a copy of Judge Baer's decision until July 29, after plaintiff had already committed to representing her.  She did not give him a copy of the decision

suspending her from practice in the Southern District until September 6. On July 29 she gave plaintiff three volumes of the Appendix on Appeal; she only gave him the remaining two volumes of the Appendix on November 29, three days before the appeal was to be argued. This delay in supplying plaintiff with necessary papers was intended by her to impede or delay his realizing that she had misrepresented the facts of the case to him.

23.     Although plaintiff believed that Peters was entitled to representation by counsel on the Appeal, he did not believe that she was entitled to be represented by him. He agreed to represent her on July 14, 2008 solely on the basis of the representations she made to him on that date, including the misrepresentations alleged in paragraphs 20 and 21 above.

24.     Plaintiff and Peters agreed that plaintiff would bill for his services at the rate of $500 per hour; that he would record his time in increments of tenths of an hour; that he would bill her promptly at the end of each month; and that she would pay his bills promptly and in full.

25.     Because he accepted Peters' false representation that she was an innocent victim of a palpable injustice, plaintiff also resolved that he would accommodate Peters financially by not billing her for all the time he spent on her case. Thereafter, he routinely recorded and billed only some of his time. This was done in reliance on Peter' representation and promise that the time he did bill would be paid promptly and in full. Only after December 2, 2009, when he began to doubt the truth of Peters' representations in this regard, did plaintiff begin to record and bill all his time worked on her case.

### The Retainer with the Collazo Firm

26.     Shortly after plaintiff commenced work, the parties began to discuss whether he should appear in the Second Circuit solely in his own name, or whether he should add the Collazo Firm as of counsel. Although this was not a Collazo Firm matter, plaintiff agreed that it

might be to Peters' advantage to have the name of a respected law firm associated with her case. This decision was disadvantageous to plaintiff financially, since on matters he brought to the Collazo Firm that firm and he shared fees on an equal basis. However, plaintiff's decision to accept Peters' case was not motivated by financial considerations, and he agreed to handle the case as a Collazo Firm matter. He would not have involved the Collazo Firm in Peters' affairs had he not believed the representations made to him by Peters on July 14, including those set forth in paragraphs 20 and 21 above.

27. Plaintiff and Peters met at the offices of the Collazo Firm on July 29, 2008 and executed a standard retainer on that firm's letterhead. The retainer embodied and confirmed the billing arrangements previously agreed to, as set forth in paragraph 24 above. The retainer also contained a clause providing that any fee disputes would be subject to arbitration before the New York City Bar Association. The Collazo Firm and Peters are presently engaged in an arbitration proceeding under the auspices of the City Bar regarding unpaid bills rendered to Peters. In the course of that proceeding, and pursuant to the scheme described in paragraph 14 above, Peters has perpetrated numerous frauds on the tribunal.

28. Shortly prior to their July 29 meeting, Peters told plaintiff that Marc Mukasey, one of the lawyers she had retained at an earlier stage of the case, had billed her $200,000 for preparing a 29-page brief, and that the amount of the bill came as a surprise to her when it was rendered. She said that she would not like to repeat that experience, and would prefer to establish a budget in advance for plaintiff's work; and she wanted his commitment that he would not exceed that budget without prior notice to her. She suggested that the budget be $25,000, representing 50 hours of work. Although that number seemed to plaintiff to be on the low side, he had no problem with the concept of a budget that would not be exceeded without notice to,

and consent from, Peters.  Thus, he added to the retainer a clause stating:  "We have also agreed that our fees will not exceed $25,000 without your prior consent."

29.     The budget proposed by Peters, like the retainer itself, was limited to preparation and delivery of an oral argument on appeal.  Plaintiff accepted the budget proposed by Peters in good faith, and in reliance on the representations and promises she had made to him.  For Peters, on the other hand, the budget was merely a ploy, pursuant to the scheme described in paragraph 14 above, to lay the groundwork for assigning additional projects to plaintiff and then refusing to pay for them.

30.     Notwithstanding the retainer, plaintiff continued to do virtually all of his work on Peters' matters from his home office, and – unlike other matters he handled through the Collazo Firm – he bore personally almost all the overhead costs of the representation (since he did not charge his own clients for expenses such as telephone, postage, photocopying and local transportation, but absorbed those costs in his hourly rate).

31.     Before the parties executed the retainer, Peters (who had intimate knowledge of her case) told plaintiff that she expected the appeal to be argued within a month or two, and that plaintiff should be able to do the work requested in 50 hours or less.  In fact, over the five months that followed, she consumed some 140 hours of plaintiff's billable time, and many more hours that he did not bill.  To date, Peters has paid for only 35% of the time that plaintiff billed to her (and, of course, for none of the time that he did not bill).

### Peters' Expansion of the Representation

32.     Although plaintiff's representation of Peters was supposed to be limited to presenting oral argument on the Appeal, Peters began to expand the representation even before the retainer was signed.  Pursuant to the scheme described in paragraph 14 above, she

continually gave new assignments to plaintiff, some connected to the appeal and some not connected, but then failed and refused to pay for the work done on those extra assignments.

33.    At the time plaintiff took on Peters' representation, she had at least four different, but related, sets of proceedings pending, all arising from this Court's issuance of sanctions against her.  The first were the set of Second Circuit appeals from Judge Baer's decision and related orders.  The second were proceedings before the Grievance Committees of the Southern and Eastern Districts of New York, which suspended Peters from practice in those districts pending resolution of the appeal.  The third were proceedings in the District of Connecticut and before the Connecticut State Bar, which had under consideration whether to impose sanctions against Peters on account of her conduct described in Judge Baer's decision.  And, finally, Peters and her former law firm, Dorsey & Whitney, were embroiled in litigation in Minnesota over which of them owed the other money after the *Wolters Kluwer* debacle and Peters' forced resignation as a partner of that firm.

34.    All of these matters were closely related, in that they arose out of Judge Baer's sanctions decision, and their outcomes would likely turn on whether, or to what extent, that decision might be affirmed or overturned on appeal.  In due course, Peters asked for plaintiff's assistance on the three matters besides the appeal, which he accepted as a natural extension of the original representation.

35.    Specifically, in September 2008 Peters asked for plaintiff's assistance in the Connecticut and Eastern District proceedings, and in October she asked for his assistance in the Minnesota litigation.  Initially, plaintiff's work on these matters was billed, along with his other work, through the Collazo Firm.

**New Billing Arrangements for the Minnesota and Connecticut Matters**

36.      After Peters asked plaintiff to assist her with the Connecticut and Minnesota matters and he began working on them, the parties decided to re-visit the billing arrangements. The Collazo Firm was involved in the representation solely to give Peters the use of its name on the appeal.  The actual work involved, on both the appeal and the other matters, was being done by plaintiff at his home office, not at the Collazo Firm.

37.      These considerations led the parties to agree in mid-October 2008 that, thenceforth, plaintiff's work on the Minnesota and Connecticut matters would be billed to Peters directly by him.  Thereafter, plaintiff billed Peters separately for that work done by him, at her request, in October, November and December 2008.

38.      Plaintiff argued the Appeal in the Second Circuit on December 2, 2008.  Prior to that date, Peters had never raised any objection to his bills in the Minnesota and Connecticut matters, and in fact she had repeatedly promised to pay them.  Once the appeal work was concluded, however – and Peters no longer needed plaintiff's services – she began to raise obstacles to her paying those bills.  Pursuant to the scheme described in paragraph 14 above, Peters has not paid any of those bills to date.  The total of the unpaid bills is $11,850, based on the discounted number of hours billed by plaintiff for the Minnesota and Connecticut work; the fair value of the work done was much greater.

**Plaintiff's Work in the Minnesota Matter**

39.      In October 2008, when Peters asked plaintiff to assist her in the Minnesota litigation, she was represented in that matter by James Kaster, Esq., of Minneapolis, who subsequently withdrew from the matter.  On information and belief, Peters secured Kaster's

services on a contingency basis, by misrepresenting the facts of her case to him.  Kaster represented Peters for many months, and was never paid by her for his services.

40.     Peters asked plaintiff to assist her in the Minnesota litigation in two areas:  she wanted his general strategic advice, and she wanted him to conduct discovery in New York. Plaintiff agreed to fill this role, but he made it clear to plaintiff that in no event would he travel to Minnesota, or prepare any papers for submission to the Minnesota court.

41.     Plaintiff asked Peters to send him copies of the pleadings in the Minnesota litigation, but she never did.  At one point plaintiff agreed to appear as counsel for Peters *pro haec vice* in that litigation, so that he could serve as counsel in New York depositions, and sent the necessary information to Kaster, but the motion never was filed.  Ultimately, plaintiff determined that he could not be involved in the Minnesota litigation without at least seeing the pleadings.

42.     After Kaster withdrew from the matter, Peters sought other Minnesota counsel.  In interviewing prospective counsel, she misrepresented the facts of her case, and was slow to provide them with necessary papers, as she had done with plaintiff (see paragraph 22 above). She also sought, unsuccessfully, to persuade plaintiff to exaggerate the extent of his willingness to work on the matter in conversations with prospective counsel.

43.     In due course, Peters secured the services of Thomas P. Malone, Esq. as Minnesota counsel.  In securing his services, Peters misrepresented to Malone that plaintiff would serve as lead counsel in the Minnesota litigation, including preparing any necessary court papers and taking discovery, and that Malone would only have to act as local counsel.  On information and belief, Peters was slow to pay Malone's bills, and never paid them in full.

44.     On December 19, 2008, plaintiff terminated his attorney-client relationship with Peters on account of her misconduct, including the misconduct detailed in this Complaint.  After failing to persuade plaintiff not to inform Malone of this event, Peters lied to Malone about the reason that plaintiff would no longer be working on the Minnesota litigation.

### Plaintiff's Work in the Connecticut Matter

45.     In Connecticut, Peters was faced with the prospect of proceedings before the District of Connecticut and the State bar as to whether she should be suspended from practice on the basis of reciprocity because of her suspension in the Southern and Eastern Districts of New York.  Plaintiff wrote to District Judge Hall on Peters' behalf, and then negotiated with Stewart I. Edelstein, Esq., Disciplinary Counsel for the District Court.

46.     Peters had asked plaintiff to try to secure a short adjournment of the Connecticut proceedings.  In the end, he realized a significantly better result:  the District Court agreed to delay any hearing indefinitely, until the Second Circuit had ruled on the Appeal. Notwithstanding this favorable result, Peters has failed and refused to pay plaintiff anything for his work on the Connecticut matters.

47.     As noted in paragraph 44 above, plaintiff terminated his attorney-client relationship with Peters on December 19, 2008.  Peters requested that plaintiff not inform Edelstein of his withdrawal from the case, and when he declined to mislead Edelstein in this way, she lied to the District Court, through Edelstein, about the reasons for the withdrawal.

### Unpaid Time Billed by the Collazo Firm

48.     Although Peters had told plaintiff initially that she expected her appeals to be argued in the Second Circuit in late August or early September 2008 – and that thus his assignment would be quite limited in duration, which justified the $25,000 budget agreed to – in

fact the appeals were not argued until December 2, 2008. In that five-month period, Peters continually added new assignments to plaintiff's workload, without any intention of paying for that extra work.

49. The $25,000 budget, which was expected to be used up by early September, was not in fact exhausted until early November. At that time, plaintiff and Peters began to discuss alternative billing arrangements that might reduce her legal expenses. However, they failed to reach agreement on such an arrangement.

50. Once the original $25,000 budget was exhausted, Peters accelerated her demands on plaintiff's time. In addition to giving him assignments over and above the oral argument, she involved herself in the day-to-day preparation for the argument itself, micromanaging plaintiff's work and vastly increasing his time spent on that preparation. She did this pursuant to the scheme described in paragraph 14 above, anticipating that she could later argue that the $25,000 budget was an agreed flat fee, and that once it was exhausted plaintiff was obliged to keep working for her free of charge on any matters she might assign to him.

51. As December 1 approached – when plaintiff would in the normal course bill his time for November – plaintiff and Peters agreed, in effect, to put the question of billing aside so plaintiff could concentrate on his final preparation for the argument to be held on December 2. They agreed that on December 1 plaintiff would bill Peters for a small amount of November time, bringing the billing total to $25,000; that he would send her an accounting of the remaining unbilled November time; and that they would try to negotiate some kind of discount for her on that time after the oral argument.

52. At the time the parties reached the agreement described in the preceding paragraph, Peters had already decided, pursuant to the scheme described in paragraph 14 above,

that she would pay plaintiff nothing further for his services. She had no intention at that time of reaching agreement on a discount, or paying a discounted amount. Rather, she deliberately left plaintiff with the misimpression that he would be paid for his services, so that he would not withdraw from arguing the Appeal on December 2.

53. Plaintiff kept his part of the agreement described in paragraph 51: on December 1 he sent Peters a bill, through the Collazo Firm, for $5,650, for November, representing the balance of the initial $25,000. On the same date he sent her a summary, from his home office, of the approximately $27,000 in additional time he had expended in November, which he was setting aside for later billing. As the sole biller for the Collazo Firm on the matter, this was within his discretion to do. However, because these events occurred on the very busy final day of his argument preparation, plaintiff did not discuss what he had done with the Collazo Firm billing staff.

54. Pursuant to the scheme described in paragraph 14 above, Peters immediately seized on these circumstances to work a further fraud on the Collazo Firm and plaintiff.

(a) First, she sent the Collazo Firm a check (without notice to plaintiff) for the amount of its partial bill for November, with a notation that the check represented "payment in full for all work on appeal through December 1, 2008." Since the amount of the check was the same as the amount of the partial November bill, the Collazo Firm staff did not perceive any significance to this notation, and proceeded to cash the check. Peters did not call her notation on the check to the attention of the Collazo Firm or plaintiff until more than one year later, when she claimed that it was a complete defense to any claim for payment for the balance of the November time.

(b)     Second, she got in touch with Ernest J. Collazo ("Collazo"), the managing partner of the Collazo Firm, and falsely accused plaintiff of having sent her a personal bill for the $27,000 of unbilled time for November. This statement was false and defamatory, and was intended to foment conflict between the Collazo Firm and plaintiff, which Peters hoped would work to her advantage.

(c)     This defamatory statement was then re-published by Peters on April 8, 2010 in a written submission to Kathleen M. Scanlon, Esq., in which she accused plaintiff of having "issued a double bill for November time," "attempted to engage in a fraud of his prior firm," making "desperate efforts to scam his [Collazo Firm] partners," and issued "a fraudulent second set of fees and charges." These statements were similarly false and defamatory.

55.     On two subsequent occasions, Peters attempted to defraud plaintiff and the Collazo Firm by sending checks with limiting notations, but the notations on those checks were discovered and the checks were rejected. Peters has failed and refused to re-issue those checks, for amounts still due, without limiting notations.

56.     Having apprised the Collazo Firm of the true facts, and having realized that further negotiations with Peters about a discount would be both futile and unwarranted, on December 18, 2008 plaintiff sent Peters, through the Collazo Firm, a bill for the balance of the November time, in the amount of $27,000.60. Peters has failed and refused to pay this bill.

57.     After the oral argument of the Appeal was concluded, Peters insisted, over plaintiff's objection, that he send a letter to the appeals panel concerning statements made by other counsel at oral argument. On January 2, 2009, the Collazo Firm billed Peters $6,800.40 for plaintiff's work in December. Though most of this work was done after the oral argument – and

thus could not conceivably have been covered by the budget – Peters has failed and refused to pay this bill.

### The Demizio Case

58.     In 2008, Peters was representing a defendant, Darin Demizio, in a criminal case in the Eastern District before Judge Gleeson (*US v. Darin Demizio*, 08-cr-336 (JG)).  She was suspended from practice in that district as of August 8, 2008, but Judge Gleeson permitted her to remain as Demizio's counsel, provided she could find another lawyer to sign papers and make court appearances on Demizio's behalf.

59.     In September 2008, Peters asked plaintiff to serve as her co-counsel, and as counsel of record, in the Demizio case.  She knew he had no background in criminal matters, but said she would do all the substantive work, and plaintiff would only have to sign papers and appear at court conferences.  After meeting Demizio, plaintiff accepted this assignment as an accommodation to both Demizio and Peters.

60.     Peters represented to plaintiff that she was working diligently at the time to have her suspension in the Eastern District lifted, and she told him she expected to be able to take over again as counsel of record in the Demizio case within a matter of months.  However, her efforts to have her suspension lifted did not succeed.

61.     Throughout the period when plaintiff served as co-counsel to Peters in the Demizio case, she functioned as chief counsel and he assisted her only to the extent requested.  Peters billed both lawyers' work on the case to Demizio's employer, Morgan Stanley & Co., through her law firm, listing plaintiff as of counsel to that firm.  Peters told plaintiff that this arrangement was fully in accord with Judge Gleeson's orders in the case.

62.     Peters did not fulfill her part of the co-counsel arrangement, in that she allowed personal commitments to take priority over her work on the matter; she subordinated Demizio's interest in an early trial to her own interest in protracting the case; she failed to prepare high-quality papers on a timely basis; and, in the case of a motion to dismiss scheduled by Judge Gleeson, she failed to prepare any papers at all, forcing Demizio to give up his opportunity to make such a motion.

63.     In the course of plaintiff's work as counsel of record in the Demizio case, from time to time he came into conflict with Peters over tactics which she wished him to employ, and of which he did not approve on ethical grounds.  For example, when Judge Gleeson set a trial date in February 2009, Peters lambasted plaintiff for not telling Judge Gleeson that he had other commitments in January that made that trial date inconvenient.  When plaintiff responded that he could not have made such a representation to the court because it was not true, she responded that judges always accept such statements from counsel without question.

64.     In early October 2008, Demizio asked Peters to secure permission from the court for him to travel with his son to a youth event in Washington, DC in late October.  At Peters' direction, plaintiff wrote a letter to Judge Gleeson seeking such permission, but the court denied the request because the views of the Pretrial Services Agency had not been solicited.  Plaintiff offered to Peters to secure that Agency's consent, but she said she would handle the matter herself.  She negotiated the consent directly with the Agency, by telephone, without sending that office a copy of the letter from plaintiff to the court.  She then obtained the Agency's consent by e-mail, and forwarded a copy of the e-mail to plaintiff.

65.     With just a few days to go before the scheduled trip, plaintiff wrote to Judge Gleeson again, enclosing the e-mail showing the Agency's consent.  The e-mail to the Agency

had been signed by Peters "Frank Carling and Kristan Peters, Counsel for Darin Demizo."  The following events ensued:

        (a)     Judge Gleeson, on seeing that Peters was holding herself out to the Agency as Demizio's counsel despite her suspension, referred the matter to Judge Brian Cogan for a determination as to whether Peters had violated her suspension.

        (b)     Peters then upbraided plaintiff, claiming that the parties had agreed that plaintiff would delete her name from the e-mail before submitting it to Judge Gleeson.  No such "agreement" had been discussed, let alone reached; indeed, plaintiff knew nothing about the e-mail from the Agency until Peters forwarded it to him.  (Peters' suggestion that the e-mail should have been altered was particularly troubling, because one of the charges heard in the sanctions proceeding was that Peters had altered an e-mail from Judge Baer before sending it to her partners at Dorsey & Whitney.)

        (c)     The parties then discussed what should be said in a letter to Judge Cogan. Peters was intent that the true relationship of the parties as co-counsel in the Demizio case should be kept hidden from Judge Cogan, and she made various suggestions for how that could be accomplished.  Plaintiff resisted these suggestions, and in the end Peters wrote to Judge Cogan herself, on or about October 30, 2008.

        (d)     Peters' letter to Judge Cogan contained at least one misstatement of fact, which plaintiff specifically had asked her to delete from the letter, and its overall tenor was misleading.

        66.     On December 5, 2008, Judge Gleeson scheduled a final pre-trial conference in the Demizio matter for January 23, 2009, and set a trial date of February 2, 2009.

67.     When it became clear that Peters would not likely be able to get her suspension lifted in time to handle the Demizio trial, she sought other counsel to handle the case.  In due course she selected an outstanding member of the criminal defense bar, David Spears of Spears & Imes LLP, to take over the case, and Demizio approved the selection.  Although plaintiff was counsel of record for Demizio, he was not included by Peters in this process, and had no specific knowledge of the arrangements made.

68.     Peters then adopted a strategy of trying to achieve a delay in the trial by having Spears appear at the last minute as new counsel.  On information and belief, Spears declined to follow this strategy, on the ground that it would be unethical to conceal from Judge Gleeson the actual date of his retention.

69.     On December 12, 2008, Spears made a motion for substitution of counsel, to which I consented.  On December 18, Judge Gleeson granted the motion.  At Demizio's request, Spears also displaced Peters from her role as co-counsel, although for a time she resisted this.

70.     Since that time, Peters has falsely accused plaintiff of undermining her relationship with Demizio by consenting to Spears' motion without advance notice to her.

71.     Early in the week of December 15, 2008, Peters told plaintiff's former partner Collazo, in a telephone call concerning her refusal to pay the Collazo Firm in full for plaintiff's services on the Appeal, that plaintiff had sabotaged her relationship with Demizio by making derogatory comments to him about Peters.  This statement was false and defamatory when made. Plaintiff had never made any critical remarks to Demizio about Peters.  Peters' accusation to the contrary was made with actual malice, in that it was made (a) in retaliation for plaintiff's opposing her unethical practices in the Demizio case, and (b) in an effort to discourage Collazo from authorizing plaintiff to collect fees duly owed to him and the Collazo Firm.

72.     Although the Second Circuit ultimately affirmed Judge Baer's sanctions order, it explicitly affirmed only three of the trial court's factual findings, and those concerned some of the less serious of the charges against Peters.  Thus, plaintiff's work on the argument of the Appeal was substantially successful, and has enabled Peters to contend that Judge Baer's most damaging factual findings are not *res judicata*.

73.     In reliance on her representations, plaintiff made Peters' legal problems his top priority for five months in 2008.  In addition to the many hours, billed and unbilled, that he devoted directly to her matters, he deferred his own plans to build an alternative dispute resolution practice in order to be available to her at all times.  His communications with Peters were often late at night, early in the morning, and on weekends.  For this extraordinary effort on her behalf, he has been paid by Peters to date approximately $12,500.

## FIRST CLAIM FOR RELIEF
## (FRAUD)

74.     Plaintiff repeats the allegations in paragraphs 8-73 above as though fully set forth herein.

75.     Peters' conduct constituted a continuing fraud on plaintiff.

76.     Plaintiff was injured by Peters' fraud, in that, in reliance on her false statements, he gave her first priority on his time for some five months, foregoing other opportunities; that he was never compensated fairly for his time and services; and that he invested substantial time, and incurred substantial expenses, in attempting to collect what he was owed.

77.     Plaintiff is entitled to an award of $150,000 in compensatory damages, and to an award of such punitive damages as may be found at trial.

## SECOND CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

78.     Plaintiff repeats the allegations in paragraphs 8-77 above as though fully set forth herein.

79.     Peters' failure and refusal to pay the amounts billed to her directly by plaintiff for services rendered constituted a breach of contract.

80.     Plaintiff is entitled to an award of damages in the amount of $11,850 for work billed by him.

## THIRD CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

81.     Plaintiff repeats the allegations in paragraphs 8-80 above as though fully set forth herein.

82.     This claim is pleaded in the alternative to plaintiff's Second Claim for Relief.

83.     Referring to the allegations in paragraph 54(a) above, if it should be found that the Collazo Firm waived its right to bill Peters for the unbilled November time by cashing the check containing a limiting notation, then Peters is liable to plaintiff for the amount of the unbilled November time, or $27,000.

84.     Plaintiff is entitled to an award of damages in the amount of $38,850, the contractually agreed value of his time billed on Peters' matters prior to December 1, 2008.

## FOURTH CLAIM FOR RELIEF
### (QUANTUM MERUIT)

85.     Plaintiff repeats the allegations in paragraphs 8-84 above as though fully set forth herein.

86.     This claim is pleaded in the alternative to plaintiff's Second Claim for Relief.

87.     The fair value of plaintiff's services far exceeded the amounts that were billed to Peters by the Collazo Firm and plaintiff.

88.     Peters should be required to pay the full value of plaintiff's services, for two reasons:

(a)     As alleged in paragraph 25 above, plaintiff gave Peters discounted services in reliance on the misrepresentations she made to him in connection with his retention. Peters is not entitled to retain the fruits of her fraud.

(b)     By failing to pay the amounts of plaintiff's discounted bills, and breaching her contract with him in that regard, Peters forfeited any right she may have had to a discount for plaintiff's services.

89.     Plaintiff is entitled to a judgment for the fair value of his services rendered to Peters.

## FIFTH CLAIM FOR RELIEF
### (NEGLIGENCE *PER SE*)

90.     Plaintiff repeats the allegations in paragraphs 8-89 above as though fully set forth herein.

91.     In her dealings with plaintiff, Peters engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation.

92.     Peters' conduct constituted a breach of DR 1-102(A)(4) of The Lawyer's Code of Professional Responsibility (the "Code") in effect in New York at the time of the events in question.

93.     The Code had the force of a New York statute, and was enacted to protect members of the public, like plaintiff, from injury on account of lawyer misconduct.

94.     Peters' breaches of the Code injured plaintiff, and constituted negligence *per se*, for which Peters is subject to absolute liability.

95.     Plaintiff is entitled to such compensatory and punitive damages as may be found at trial.

### SIXTH CLAIM FOR RELIEF
### (DEFAMATION)

96.     Plaintiff repeats the allegations in paragraphs 8-95 above as though fully set forth herein.

97.     The statements made by Peters set forth in paragraphs 54(b) and (c) and 71 above were false and defamatory.

98.     The statements in question were made with actual malice, and constituted defamation *per se*, in that they impugned plaintiff's fitness in the performance of his profession.

99.     The statements in question injured plaintiff's reputation and his relationship with his former partner, Collazo.

100.    Plaintiff is entitled to an award of compensatory damages and such punitive damages as may be found at trial.

### SEVENTH CLAIM FOR RELIEF
### (BREACH OF THE COVENANT OF
### GOOD FAITH AND FAIR DEALING)

101.    Plaintiff repeats the allegations in paragraphs 8-100 above as though fully set forth herein.

102.    The attorney-client relationship between the parties was contractual in nature, and was entered into in New York.

103.    As a matter of law, every New York contract contains an implied covenant of good faith and fair dealing.

104.    Peters' repeatedly breached the covenant of good faith and fair dealing in her dealings with plaintiff, and he was damaged thereby.

105.    Plaintiff is entitled to an award of such damages flowing from this breach of the covenant of good faith and fair dealing as may be found at trial.

WHEREFORE, plaintiff prays for judgment as follows:

(a)    On the First Claim for Relief, for $150,000 in compensatory damages, and for such punitive damages as may be found at trial.

(b)    On the Second Claim for Relief, for $11,850 in damages for breach of contract, together with prejudgment interest.

(c)    On the Third Claim for Relief, for $38,850 in damages for breach of contract, together with prejudgment interest.

(d)    On the Fourth Claim for Relief, the fair value of plaintiff's services rendered to Peters, as may be found at trial.

(e)    On the Fifth Claim for Relief, for such compensatory and punitive damages as may be found at trial.

(f)    On the Sixth Claim for Relief, for such compensatory and punitive damages as may be found at trial.

(g)    On the Seventh Claim for Relief, for such damages for breach of contract as may be found at trial, together with prejudgment interest.

(h)    Together with such other and further relief as may seem just to the Court.

Dated:  New York, New York
        June 11, 2010

FRANCIS CARLING

/s/ Francis Carling

_____
(*Pro Se*)

174 East 74th Street, Suite 12BC
New York, NY 10021-3533
(212) 628-3026
fcarling@gmail.com